IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| L. FOSTER CONSULTING, LLC, | ) | |
| | ) | |
| Plaintiff/ | ) | |
| Counterclaim-Defendant, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:11-cv-00800-REP |
| | ) | |
| XL GROUP, INC., | ) | |
| | ) | |
| Defendant/ | ) | |
| Counterclaim-Plaintiff. | ) | |

L. FOSTER CONSULTING, LLC'S MEMORANDUM IN OPPOSITION TO XL GROUP,
INC.'S MOTION FOR SUMMARY JUDGMENT

L. FOSTER CONSULTING, LLC ("LFC"), pursuant to Fed. R. Civ. P. 56 and LR 56,

submits this memorandum in opposition to XL Group's motion for summary judgment.

Introduction

XL is attempting to avoid a jury trial by urging the Court to adopt a simplistic,

mechanistic and wrong view of the law, and then suggesting that there are no disputes of

material fact.  Because XL is wrong on the law and both wrong and incomplete on the facts, its

motion should be denied.  The jury should be allowed to resolve the disputes.

Statement of Disputed Facts as to Which There Exists a Genuine Dispute

Suffice it to say the actual facts are very different from those described in XL's

submissions.

XL is a software company that provides software and support services to companies,

primarily to help them monitor their sales forces' activities.  (Ex. A, Foster Dep. 42:14-21, May

30, 2012.)  Some of XL's clients were pharmaceutical companies, and in 2009, XL started

thinking of ways to expand its offerings to those companies.  (*Id.* 40:7-22.)  XL reached out to LFC.  (*Id.*)   LFC is a limited liability company that specializes in the development of pharmaceutical sample management programs, policies, procedures and program audits that are tailored to the needs of client companies.[1]  (*Id.* 20:18-22:10.)  LFC's principal, Leah Foster, had developed an outstanding reputation with pharmaceutical companies, and LFC's services were highly prized and often sought.  (*Id.* 21:4-22:10, 216:10-13.)

LFC accepted an invitation to come to XL's headquarters in Doylestown, PA.  (*Id.* 40:4-7.)  Ms. Foster represented LFC.  LFC and XL first met on March 25, 2009, to discuss their business capabilities and interests.  (*Id.* 41:10-21.)  XL was led by Paul Schmucker, its president at the time.  The group discussed the possibility of developing a web-based PDMA sample management system that would automate the processes that LFC had already developed through its industry knowledge and expertise.  (*Id.* 41:18-44:15.)  LFC certainly knew the processes that companies needed and wanted.  XL thought it could work with LFC to put them into computer code.  (Ex. B, Schmucker Dep. 23:8-17, May 1, 2012.)  At the end of the meeting, they agreed they had a great idea and they decided to join forces to create a web-based PDMA sample management system.  (Ex. A, Foster Dep. 40:4-44:3, 51:9-10, 63:23-64:3.)

The question going forward was what form their collaboration would take.  From the very beginning, LFC sought and XL agreed in principle to an equity stake for LFC in the product of their collaboration.  (*Id.* 43:9-21.)  They started work right away.  As they worked, they exchanged proposals regarding the form of their business.  (*See* Exs. C-H, Schmucker Dep. Exs. 5-8; Foster Dep. Ex. 22; Schmucker Dep. Ex. 9.)  None was drafted by counsel, skilled or otherwise.   All were aimed at forming some kind of joint venture.  (Ex. B, Schmucker Dep.

---

[1] The PDMA laid out rules that pharmaceutical companies must follow to keep track of the sample drugs that pharmaceutical reps hand out to doctors and hospitals.  (*Id.* 18:12-19:1.)

69:1-70:12.)

One of the early proposals called for the parties to keep track of their time on the project, to put a value on it and to split ownership percentages accordingly. (*See* Ex. F, Schmucker Dep. Ex. 8, p. 2.) LFC wisely rejected that idea; LFC had one employee/member—Leah Foster— while XL had over 50 employees. Under such an arrangement, LFC would be contributing vital expertise that would be valued no differently from the time spent by a number of XL functionaries with no PDMA and industry expertise at all, the result being that XL with its many employees/contributors would own a much higher percentage of the joint venture than LFC with its one employee/contributor. Ultimately, the parties agreed that their business would be a joint venture known as ClaritySM and that each would own 50%. (*See* Ex. H, Joint Venture Agreement ("JVA"), Schmucker Dep. Ex. 9.)

The JVA had some key provisions, and to help the Court find them we have numbered each line of the JVA. (*See* Ex. I.) First, it established the relationship as a joint venture. (Ex. I, Lines 1-4, 10-16.) Second, it recognized that the value of the parties' contributions were the same: 50/50, a direct match of the ownership percentages. (*Id.*, Lines 17-18.) Third, it stated the purpose of the joint venture: to develop and sell sample management services for PDMA compliance. (*Id.*, Lines 1-4; *see also* Ex. B, Schmucker Dep. 153:11-13.) Fourth, it stated that the skills and capabilities possessed by both parties were deemed to be "of equal value and importance to the stated purpose of the joint venture." (Ex. I, Lines 11-13.) Fifth, it said that either party could terminate the joint venture and trigger an accounting. (*Id.*, Lines 48-53.) Sixth, it said that whatever belonged to a party before the joint venture would belong to that party after the joint venture. (*Id.*, Lines 57-61; *see also* Ex. B, Schmucker Dep. 35:7-16; Ex. A, Foster Dep. 82:16-83:7.)

3

At first, XL outsourced the basic code-writing to India.  (Ex. B, Schmucker Dep. 120:9-21; Ex. J, Wiedemann Dep. 242:1-6, Jun. 13, 2012.)   What came back was a worthless mess. (Ex. B, Schmucker Dep. 120:9-15.)  Not only were there errors in the lines of code, the code writers had no idea how pharmaceutical companies or the PDMA worked.  Without the direction of an expert (namely, LFC) there was "no oversight" from an industry expert and what they came up with was gibberish.  (Ex. A, Foster Dep. 597:9-12; *see also* Ex. B, Schmucker Dep. 120:9-15; Ex. K, Foster Dec ¶ 12.)

With code-writing back in the U.S., LFC became a constant presence at XL headquarters. Foster participated in meetings.  (Ex. A. Foster Dep. 77:24-78:20, 300:18-301:5.)  She met with Bob Wiedemann (then CFO and lead programmer for coding the system) and others repeatedly and gave specific direction regarding what the system needed to do, how it needed to do it and how the companies and their sales forces would need to be able to interact with it.  (Ex. K, Foster Dec. ¶ 5, 7, 9-11.)  She directed the creation of the software, especially the interface between the code and the user.  (*Id.* ¶ 10.)  For instance, LFC instructed the XL functionaries how to make the terms and conditions, privacy policy, copyright, customizable, logout hyperlink and username tabs functional.  (Ex. A, Foster Dep. 214:13-215:7.)  LFC provided the information that is embedded in the technical design specification (*Id.* 198:9-199:2; 201:24-202:22.); the software design specification (*Id.* 211:14-215:12.); the functional requirements document (*Id.* 224:18-21.); and the sample management planning document.  (*Id.* 184:8-12, 240:6-9.)  LFC even "authored active monitoring rep profile and scorecard, reconciliation, signature, verification, investigations, and optimization" features."  (*Id.* 215:8-12.)[2]  In sum, LFC provided

---

[2] XL suggests (without actually saying so) that all of LFC's contributions were "oral."  In XL's view, one who makes only "oral" contributions cannot be an author.  Not only is this incorrect as a matter of law, it is incorrect as a matter of fact to suggest that all of LFC's contributions were

"the blueprint" and the foundation of the software system  (*Id.* 217:12, 235:13-23; 328:15-329:6; 643:1-7.)[3]  All of these contributions were included in the source code.  (Ex. K, Foster Dec. ¶ 9-10.)[4]

XL acknowledged that LFC's contributions were vital to the creation of the program. XL's president wrote, "[W]e will be relying on your expertise to guide us through the development process."  (Ex. H, Schmucker Dep. Ex. 9.)  XL's then CFO, Bob Wiedemann, wrote, "We need you on the Clarity team because, as we have said many times before, this was built around you and your abilities."  (Ex. L, Wiedemann Dep. Ex. 59.)  Without LFC, XL could not make a fully-functional web-based PDMA sample management system.  (Ex. A, Foster Dep. 77:24-78:20.)

The parties' hard work paid off.  On December 22, 2009, the joint venture landed its first contract: an agreement to provide the web-based ClaritySM service to Noven Pharmaceutical. (Ex. M, Foster Dep. Ex. 29.)  The service was to be operational on March 1, 2010.  Noven would pay a start-up fee of $54,663 on that date, monthly service fees of $17,322 and certain pass-through costs.  (*Id.* at 23.)

Unfortunately, LFC soon learned that XL had not held strictly to what Mr. Schmucker had presented as XL's "Paycheck Theory": "Always on time, always accurate, always increasing."  (Ex. N, Foster Dep. Ex. 116.)  There were even more delays than one would expect in a new program being rolled out to its first user.  Noven wrote a letter voicing its concerns.

---

"oral."  For the latter reason, LFC disputes Paragraphs 36-37 of XL's Statement of "Undisputed" Facts.

[3] LFC does not dispute that XL provided contributions to the joint venture that led to the development of the web-based PDMA sample management system.  (*Id.* 395:16-25, 396:1-4.)

[4] To extent that LFC was not involved in certain decisions, XL wouldn't allow LFC to be a part of the decisions.  (*Id.* 126:23-127:127:4.)  As discussed in Foster's affidavit (Ex. K), XL's characterization of LFC's involvement in the programming of the web-based PDMA sample management system is inaccurate.  Therefore, LFC disputes ¶¶ 15-28 of XL's undisputed statement of facts.

(Ex. O, Foster Dep. Ex. 33.) Because of these delays, the ClaritySM service was not made available to Noven until May 1, 2010, two months late. (Doc. No. 45 ¶ 18.) LFC was shaken. After all, LFC's business depended on its reputation and its performance. The joint venture was a side business, but its delays and problems were threatening LFC's core. Still, Mr. Schmucker assured everyone that the glitches were routine and would be fixed. Trusting he was right, LFC stuck with the joint venture and, before long, another contract was landed, this time with Cornerstone on June 2, 2010. (Ex. P, Foster Dep. Ex. 34.)[5]

Unfortunately, the glitches were more troublesome than Mr. Schmucker had led LFC ClaritySM's clients to believe. With each passing day, the situation became more and more threatening to LFC's core. In addition, Mr. Schmucker was increasingly acting less like a joint venturer and more like someone out for himself.[6] For LFC, which needed its good reputation and which had entered the joint venture based on promises of trust and respect, (*see* Ex. Q, Foster Dep. Ex. 20,)[7] this was too much. On July 21, 2010, LFC pulled the plug and announced that it was exercising its right to terminate the joint venture. (Ex. R, Foster Dep. Ex. 104.)

At that point, under both the JVA and Pennsylvania law, there was to be an accounting and either a distribution of assets (if the business was to be wound down) or a sale of the business (if someone—either one of the venturers or a third party—wanted to keep it going). That is what LFC asked for on August 23, 2010 and again on November 8, 2010[8]. (Exs. S & T,

---

[5] In its Statement of Facts, XL seems to suggest that XL signed the agreements for itself. (*See* Doc. No. 89, ¶ 8.) The documents were, on their face, contracts to provide the ClaritySM system. (See Exs. M & P, Noven and Cornerstone Contracts.)

[6] Despite LFC's objection, XL registered trademarks for ClaritySM in its own name, not in the name of the joint venture. (Ex. A, Foster Dep. at 590:10-591:9.)

[7] E-mail from Schmucker to Foster on 7/28/2009: "I think our respect and trust in each other are two things that are more important than anything in making this work and there is no written agreement that will guarantee that!"

[8] LFC disputes ¶¶ 34-35 of XL's undisputed statement of facts. (Doc. 89 at 10-11.) Because XL did not provide reliable and complete financial data, Mr. Heinberg could not conduct a complete

Foster Dep. Ex. 128, 129).  But XL would not give it, at least not the way XL was supposed to. XL elected to ignore the provision in Lines 17-20 to the effect that the parties' contributions and ownership were equal.  Even worse, XL seized complete control over the joint venture's web-based PDMA sample management system: ClaritySM.  No matter how much LFC pleaded, XL would not budge.  It had resolved to put the screws to LFC and was doing its best to do just that.

On October 15, 2010, LFC made a last ditch effort to wrap up the venture.  (Ex. A, Foster Dep. 694:18-695:2.)  It offered to waive advancements of $240,000 and to pay $400,000 in cash in exchange for XL's ownership share in the ClaritySM asset.  (Ex. U, Heinberg Report, Ex. 7; *see also* Ex. A, Foster Dep. 592:7-593:10; Ex. B, Schmucker Dep. 146:25-147:4.)  XL rejected the offer, saying, "Clarity is worth a lot more than that."  (Ex. A, Foster Dep. 592:7-593:10, 595:4-6.)

XL continued to hold ClaritySM and the advancements hostage.  At last, LFC could take no more.  LFC filed this action on August 3, 2011.

<u>Argument</u>

I.    <u>Introduction.</u>

LFC seeks relief on four grounds.

First, LFC seeks a declaration that it is an author and owner of the web-based PDMA sample management system known as ClaritySM.  (Doc. No. 45 ¶¶ 26-33.)

Second, LFC contends that XL materially breached the contract it entered into with LFC based on its failure to (1) account for the sample management system as an asset of the joint venture, (2) make a good faith attempt at valuing and allocating the joint venture's asset, (3) title the trademark in both parties' names, and (4) submit an accounting.  (*Id.* at ¶¶ 37, 38.)

---

financial analysis of the joint venture.  (Ex. AA, Heinberg Report at 4.)  However, Mr. Heinberg's report does contain future projections.  (*Id.*)

Third, LFC contends that XL has committed fraud based on XL's misrepresentations. Specifically, former president of XL, Paul Schmucker, has testified that on July 28, 2009, XL intended to jointly develop the web-based PDMA sample management system with LFC.  (Ex. B, Schmucker Dep. 78:11-24.)    Schmucker testified that XL's intent changed after July 28, 2009.  (*Id.* 79:23-80:7.)   However, Schmucker and XL never informed LFC of that change before signing the agreement.  (*Id.* 81:22-82:3.)   This was a fraud in the inducement.

Fourth, LFC contends that XL failed to exercise its duty of good faith and loyalty to its co-venturer, LFC, by failing to provide an accurate accounting.  (Doc. No. 45 ¶¶ 40-52.)   XL also breached its duties by monopolizing the 50/50 joint venture agreement by trademarking the joint venture's asset in its own name despite LFC's objection (Ex. A, Foster Dep. 590:10-591:9.)

XL has counterclaimed, seeking a declaratory judgment that it is the sole owner of the ClaritySM system.  (*See* Doc. No. 50 ¶ 43.)   XL is also now taking the position that LFC must pay XL for its employees work during the joint venture and for work they did for years <u>after</u> the joint venture was terminated.  XL is also seeking an order that LFC has to pay a percentage of XL's overhead and expenses on its other projects—projects that had nothing to do with ClaritySM.  Paradoxically, XL is also claiming that there is no joint venture asset for LFC to own half of.  It says there is no such thing as ClaritySM, that there is no asset to be divided. According to Mr. Schmucker, "There is no ClaritySM software.  There's a ClaritySM Noven, there's a ClaritySM Cornerstone, and a ClaritySM Azur,[9] all three of which are different."  (Ex. B, Schmucker Dep. 126:1-12.)  XL has presented LFC—and hopes to present the jury—with a balance sheet that has all liabilities and no assets.

---

[9] Azur is a company that signed a contract for the web based service on December 20, 2010. (Ex. V, Foster Dep. Ex. 35.).

II.    Standard Of Review.

XL has moved for summary judgment as to all counts alleged by LFC as well as Count II of its counterclaim.  (Doc. No. 89 at 1, 28.)  XL mistakenly asserts that it is entitled to summary judgment because "Foster Consulting has not presented any evidence on which a reasonable jury" could find in its favor.  (Doc. No. 89 at 14.)  That is not the way this works.  As the movant, XL bears the burden of proving that there is no genuine dispute of material fact on essential issues such that LFC cannot prevail on its claims.  *See* Fed. R. Civ. P. 56(a).  It is the responsibility to demonstrate the absence of a genuine issue of material fact.  *McCoy v. Hurst*, 2012 U.S. Dist. LEXIS 84283, at *2-3 (E.D. Va. Jun. 15, 2012) (internal citation omitted).

In several places, XL implies that, because Leah Foster, a lay person, could only think of particular evidence that was important to her during the heat of a deposition, that she has somehow precluded herself and her counsel from relying upon other evidence.  That is incorrect. A party is entitled to summary judgment only if the Court finds the record as a whole could not lead a rational trier of fact to find in favor of the non-movant.  *United States v. Adams*, 2012 U.S. Dist. LEXIS 87192, at *6 (E.D. Va. Jun. 25, 2012) (internal citation omitted).  The nonmoving party may point to specific facts anywhere in the record that show genuine issues of disputed facts exist between the parties.  *See Macon v. E.I. DuPont*, 2011 U.S. Dist. LEXIS 119339, at *17 (E.D. Va. Oct. 14, 2011).  The Court then views the evidence in the light most favorable to the nonmoving party.  *Id.* at *17-18.

As LFC will demonstrate, XL has failed to carry its burden under the applicable law.[10] There is ample evidence to support LFC's claim to ClaritySM as copyright holder (Count I) and as a joint venturer in its creation (Count II).  In addition, there is evidence from which the jury

---

[10] Federal copyright law governs Count I.  LFC agrees with XL that Pennsylvania law governs the interpretation of the JVA and that Virginia law governs Count III and IV.

could find, as an alternative to Count II, that, if the joint venture agreement means what XL now claims it to mean, then XL committed fraud in the inducement. There is evidence from which the jury could find that XL breached its fiduciary duty to (a) provide a proper accounting, (b) compensate its joint venturer LFC for the latter's share of the joint venture's assets, and (c) seizing the assets for its own exclusive use. Finally, XL has not even attempted to carry its burden of proving a right to recover on its counterclaim.

The Court should deny XL's motion in its entirety.[11]

III.   There Is Evidence From Which A Jury Could Find That LFC Is A Co-Owner Of The Copyright In The Software.

Contrary to XL's argument, there is abundant evidence from which a jury could find that LFC is a co-owner of the copyright in the software that underlies the web-based PDMA sample management program created by the joint venture. "Copyright protection subsists … in original works of authorship fixed in any tangible means of expression…." 17 U.S.C. § 102. Computer programs are copyrightable. 17 U.S.C. § 101 defines "computer program" as "a set of statement or instructions to be used directly or indirectly in a computer to bring about a particular result." There are two ways in which the jury could find that LFC is the co-owner of the copyright. First, a jury could find that LFC is a co-author or a joint work under 17 U.S.C. § 201(a). Second, the

---

[11] As an aside, LFC notes that XL is confused about the status of the case and the relief it is seeking. In its conclusion, XL asks the Court to dismiss the second amended complaint. (Doc. No. 89 at 28.) Motions to dismiss fall under Rule 12. Rule 56, under which XL is proceeding here, allows a court to grant summary judgment for one party or another on claims, not to dismiss them. *See* Fed. R. Civ. P. 56(a). Also, XL mentions from time to time what Magistrate Judge Novak has "determined." (*see e.g.* Doc. No. 89 at 27, 28.) Judge Novak has merely made a report and recommendation on the sufficiency of the pleadings, and he did so based on a motion that was filed on February 17, 2012, a long time ago in the life of this case. (*See* Doc. No. 47.) Since that motion to dismiss was filed, the parties have engaged in discovery on all of the issues, including those in Counts III & IV. For reasons of fairness and plain common sense, and as LFC has explained in its response to XL's objections to Judge Novak's recommendation, the Court should either deny the motion to dismiss to Counts III & IV as moot, grant the motion but give leave to amend, or conform the pleadings to the evidence presented in the opposition to XL's present motion. Fed. R. Civ. P. 15(b).

jury could find that the software is a "work for hire" under 17 U.S.C. § 201(b), made on behalf of the joint venture of which LFC is a 50% owner.

A.     Owner As Co-Author.

XL has failed utterly to establish that there is no dispute of material fact on the question of LFC's contributions to the ClaritySM software.  It does not even try to argue that LFC did not contribute.  Nor could it.  The excerpts from Leah Foster's deposition alone (Ex. K) describe the iterative process of designing and creating the system.[12]  LFC would provide information.  Some of it, Ms. Foster wrote and sketched herself.  (*See, e.g.,* Foster Dep. 327:12-328:18.)  Some she directed at the white board.  (*See, e.g., Id.* 233:1-20 & 391:4-14.)   Some were in emails.  (*See, e.g., Id.* 348:12-16.)  Some would be oral, but recorded by Ms. Jacque, the team's "scribe," and that information would direct the programmers.  (*See, e.g., Id.* 272:15-273:8.)  No matter how it was recorded, her contributions went "through all stages to the software."  (*Id.* 364:9-12.) Instead, XL takes the position that the only material fact is whether Ms. Foster's fingers ever punched any programming keys.[13]   Despite the fact that LFC provided the content and the information that is contained in documents and expressed in code (as the excerpts just mentioned show),[14] XL insists that only the actual person sitting at the actual keyboard can be the author of a computer program.  But the fact is that more than one person can be the author of a computer program, and one can be an "author" even if he never punches a single key.

17 U.S.C. § 101 defines a "joint work" as "a work prepared by two or more authors with

---

[12] This is deposition testimony relating to LFC's contributions to the software.  Foster's excerpt is especially long, but it is essential for showing that Paragraphs 13-37 on pages 3-9 of XL's brief are cherry pickings that misrepresent the true record and are disputed.

[13] In XL's view, if Stephen Hawking, who is paralyzed by ALS, "orally" dictated a book to a scrivener at a keyboard, he would have no copyright.  Only the scrivener would.

[14] XL refers to some of the information LFC provided as being mere regulations and preexisting material that is standard to the industry.  However, compilations of such material are expressly copyrightable, 17 U.S.C. § 101 & 103 and XL does not attempt to suggest otherwise.

11

the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."   The statute does not define "author."   Black's Law Dictionary does: "One who produces, by his own intellectual labor applied to the materials of his composition, an arrangement or compilation new in itself."   http://thelawdictionary.org/author/.   The Supreme Court has, in the copyright context, defined "author" as "he to whom anything owes its origin; originator; maker; one who completes a work of science or literature…[T]he literary productions of…authors…include all forms of writing, printing, engraving, etching, &c., by which the ideas of the mind of the author are given visible expression."  *Burrow-Giles Lith. Co., v. Sarony,* 111 U.S. 53, 58 (1883).  What copyright protects is the originality of the expression.

> "Originality is a constitutional requirement. … [Copyright protects] the fruits of intellectual labor, embodied in the form of books, prints, engravings and the like. [The Supreme] Court [has] emphasized the creative component of originality.  It described copyright as being limited to 'original intellectual conceptions of the author,' and stressed the importance of … 'the existence of those facts of originality, or intellectual production, of thought, and conception."

*Feist Pubs., Inc. v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 369-70 (1991) *quoting, in part, The Trade-Mark Cases*, 100 U.S. 82 (1879) & *Burrow-Giles Lithographic Co.* v. *Sarony*, 111 U.S. 53 (1884).

When one person provides the creativity and puts the creative expression in writing, there is but one author and identifying him is simple.  But when two people collaborate, courts must examine their contributions and what they intended when they made them.  Contrary to XL's argument, it is not as simple as identifying whose fingers were on the keyboard or whose hands were on the pen.  If the scrivener were merely putting down the exact words being dictated to him, then he is providing no creativity or originality and he cannot be an author.  But if he provides "some creative spark, no matter how crude, humble or obvious' it might be," then he too is an author.  *Feist,* 499 U.S. at 369 (*quoting* 1 M. Nimmer & D. Nimmer, Copyright §

1.08[C][1]).

"The touchstone of the statutory definition [of joint author] 'is the intention at the time the writing is done that the parts be absorbed or combined into an integrated unit.'" *Thomson v. Larson,* 147 F.3d 195, 199 (2d. Cir. 1998) (*quoting* H.R. Rep. No. 1476, 94th Cong. 120, 121 (1976), *reprinted in* 1976 U.S. Code Cong. & Admin. News 5659, 5735).   In *Thomson,* a dramaturge who assisted a playwright in "clarifying the storyline of the musical" *Rent* was found not to be a co-author (1) *in a verdict* (2) *after a trial* in which the evidence showed that (a) the actual author "absolutely, vehemently and totally" rejected the idea that anyone other than himself be the author, (b) she was working under a contract that deemed her a dramaturge instead of a co-author, (c) she got only a $2000 fee for her services and no share of ownership or profits, (d) she agreed that she would be billed as a dramaturge, and not the actual author.   *Id.* at 204-5.

On the other hand, a real estate agent who did "none of the actual layout" of a map but merely "collected available maps of taxing bodies and a divers' map locating shipwrecks in the area" did have evidence from which a jury could find he was a co-author.   *Andrien v. Southern Ocean Co. Chamber of Comm.,* 927 F.2d 132, 134 (3d. Cir. 1991).   In *Andrien,* the Third Circuit reversed a summary judgment that the map's sole author was the printing company whose employee, Haines, had assembled the other maps, synchronized the scales, labeled the street names, prepared, photographed and printed the result.   *Id.* at 133.   Among the facts that mandated a trial were evidence that the agent, Andrien, "expressly directed the copy's preparation in specific detail," Andrien's testimony that "Haines performed these assignments at his direction, 'with me at her elbow practically,'" and that she did with her hands what Andrien

told her to do as a virtual "amanuensis." *Id.* at 135.[15]

Our case is remarkably similar.  Here, the parties briefly considered an arrangement whereby LFC would merely consult for a fee, like the *Thomson* dramaturge.  Instead, they agreed to be co-venturers and to split the profits.  *See* Ex. I, Lines 50-53.  Like Andrien, LFC directed the programmers, telling them what to put where and what to make it do.  Unlike an editor who merely tweaks another's prose in the limited role of editor, LFC was present and directing the effort at the beginning, the middle and the end.  While the programmers' skill in writing and compiling lines of code was surely important, the simple fact is that they would not have known what to do or how to do it if it were not for the "creative spark" that brought the whole thing together.  A jury could well conclude that this is more than merely providing an "idea" and then leaving it to others to hammer out.  A jury could conclude, as XL's own top officers concluded, that this system could not have been created without LFC.  (Ex. L, Wiedemann Dep. Ex. 59.)  If, as the Copyright Act says, "A 'computer program' is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result," 17 U.S.C. § 101, then a jury could find that LFC specified the overall result as well as the results to be achieved on each page, and that she dictated the statements and instructions that were to be carried out by the code.

*Aldon Access. Ltd. v. Spiegel, Inc.,* 738 F.2d 548 (2d. Cir. 1984) is also informative.  Aldon claimed copyright in some statuettes.  *Id.* at 549.  Spiegel fought the claim, arguing that Aldon did not actually sculpt them; a company called Wado did.  *Id.*  But the evidence showed that, while Aldon's people never touched a tool or molded any clay, Aldon's representative

---

[15] The court noted that, at trial, the jury could find that Haines could also be a joint author if she were "more deeply involved in the preparation of the map than Andrien's testimony indicate[d]." *Id.* at 136.  But that would not change the fact that Andrien's contributions were sufficient to make him at least one of the authors.

sketched out the design and sat with the sculptor, telling him what kind of pose to use, what the musculature should look like and "adjusting attitudes and proportions" while the "model was prepared in front of [him]" to create devise "a model that [he] liked." *Id.* at 550. The court found that a jury could consider Aldon to be a joint author.

And in *Burrow-Giles,* the plaintiff was an author of a copyrightable image of Oscar Wilde not because he created Oscar Wilde, but because of

> "his own original mental conception, to which he gave visible form by posing the said Oscar Wilde in front of the camera, selecting and arranging the costume, draperies, and other various accessories in said photograph, arranging the subject so as to present graceful outlines, arranging and disposing the light and shade, suggesting and evoking the desired expression, and from such disposition, arrangement, or representation, made entirely by plaintiff, he produced the picture in suit."

*See Burrow-Giles,* 111 U.S. at 60.

*Talksip Corp. v. Xcast Laboratories, Inc.,* 2005 U.S. Dist. LEXIS 40452 (N.D. Iowa 2005) lays out a common sense authorship analysis of facts very similar to ours. Kha Phan was an entrepreneur with a marketing degree and experience in the telecommunications industry. *Id.* at *4. He owned and operated Talksip. *Id.* Vladimir Smelyansky was a software developer with degrees in mathematics and computer science. *Id.* He ran Xcast. *Id.* Smelyansky had been working on a web-based UniMessaging system that would allow users to forward phone calls to a person anywhere he could be found: home, office, pager or cell phone. *Id.* at *4-5. Phan and Smelyansky were introduced by acquaintances in 2000. *Id.* at *7. According to the evidence, by the time Phan and Smelyansky began serious discussions about working together on the UniMessaging system,

> "it [was] clear that Smelyansky and his associates had devoted a great deal of time to this product. It [was] also clear that the product was not complete and needed important creative input from Phan. After Phan became associated with the product, he became the driving force for the completion of the project.

> Specifically, while Smelyansky knew much more about writing source code, Phan knew what was necessary in order to complete and market the product. In this regard, Phan created the web interface."

*Id.* at \*8. Smelyansky argued that Phan could not be a joint author because he "made no copyrightable contribution to the source code." *Id.* at \*18. The court rejected that simplistic position.

> "It was Phan's involvement and efforts, however, that brought the product to fruition. The evidence is very convincing that the parties intended to contribute their respective expertise to the development of a 'unitary whole.' Without the source code, there would be no UniMessaging product. Likewise, without the web interface, the source code would have been worthless in a commercial capacity. Phan's contributions, while not on the same technical difficulty level as Smelyansky's source code, are more than cosmetic as defendants argue, and are necessary for the product to work."

*Id.* at \*19. Like Phan, LFC contributed what was necessary to make this software work in the business world. Unless it was something that a pharmaceutical company would actually want to buy and use, nothing created by the programmers would have any value at all. Like Phan, LFC provided at least some of the "creative spark" that made ClaritySM work.

XL's argument is based on an automaton's crimped view of cases flowing from the Second Circuit's discussion in *Childress v. Taylor,* 945 F.2d 500 (2d. Cir. 1991) of the notion that an author's contribution should be "independently copyrightable." XL incorrectly characterizes this as a "uniformly" held notion, despite the fact that the Fourth Circuit has never adopted it and the fact that it has been harshly criticized. *See, e.g.,* 6 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 6.07[A][1] (2003). But even *Childress* does not go so far as to adopt XL's view that only the physical act of pecking keys creates a "tangible expression" and that only the key pecker can be an "author" of code. But no case says that, and *Childress* does not support that view. In fact, the Second Circuit has expressly rejected it. *Medforms, Inc. v. Healthcare Management Solutions, Inc.,* 290 F.3d 98 (2d. Cir. 2002) involved

a dispute over who owned the copyright in certain software.  The outcome hinged on whether Modlin, a programmer, was an "author" of code he inputted.  There was no question that "Modlin was responsible for inputting the information into the computer to create the source code." *Id.* at 104.  However, someone else "told Modlin 'specifically what to do and how to do it' in writing the source code…." *Id.*  The Second Circuit, the same court that decided *Childress*, rejected the argument that Modlin was a co-author because he actually hit the keys and wrote the code. *Id.* at 108-9.  Because there was no proof that Modlin exercised any creativity and merely did what he was told, "the evidence supported a finding that Modlin did not make an original contribution to the work" even though he and only he had punched the keys. *Id*.  So  the  very court that decided *Childress* does not interpret it as XL urges.

That ruling makes sense, and it reflects the way software is developed.  The typical programmer has no idea how a business—say, a pharmaceutical company—works.  Computer science classes teach nothing about the PDMA or about how sales reps work with doctors and report back to companies.  Thus, a programmer is utterly incapable, on his own, of creating a program for PDMA sample management that anyone could actually use or that anyone would want to buy.  He needs direction and instruction in order to make the software do what it has to do. *Childress* never imposed a binary, who-is-at-the-keyboard approach to authorship analysis, nor would such an approach make any sense.  All *Childress* did was reluctantly and unenthusiastically adopt an "independently copyrightable" guide to ease the task of deciding who is and who is not an author. *See Childress,* 945 F.2d at 504-5.  It was admittedly "a more stringent inquiry than the statutory language would seem to suggest….," *Thomson,* 147 F.3d at 200, but it was never anything more than an aid in answering the question "who is an author" and making it easier to distinguish true authors from mere editors.  To accept XL's position

17

would be to (a) take *Childress* farther than even the Second Circuit has been willing to go, (b) add language to the Copyright Act that is not there and (c) adopt a mechanistic approach that makes no sense in the real world.

The better approach, shown by Judge Posner in *Gaiman v. McFarlane,* 360 F.3d 644 (7th Cir. 2004), is not to impose artificial rules but to get to the question: "Who are the authors?" And it is best to do so in a way that recognizes that, just as a brilliant professor who cannot write and an excellent writer with no brilliance can be joint authors, a brilliant businesswoman who knows just what a pharmaceutical company wants and needs in software can be a joint owner of software written by programmers who would not know what program to create or what it should do without the direction of the businesswoman.[16]

Besides, *Childress* does not and cannot apply to our case at all because the whole point of *Childress* was to establish guidelines in cases in which there was no written contract between the parties. *See generally* Childress, 945 F.2d 500 (2d. Cir. 1991). Here, there *is* a contract, and it specifically refers to the parties' joint contributions to jointly create a web-based PDMA sample management system that necessarily included newly created software. (*See* Ex. I, Lines 1-4, 10-16.)

Even if this Court were to apply *Childress,* there are still facts from which a jury could find in LFC's favor. In *Berman v. Johnson,* 518 F. Supp. 2d 791 (E.D. Va. 2007), the plaintiff Flynn claimed that she was the co-author of a movie entitled "Your Mommy Kills Animals," a documentary critical of PETA and other animal rights advocates. *Id.* at 792. The jury found that she was a co-author, and on post-trial motions Judge Ellis of this Court found "abundant

---

[16] XL states incorrectly that *Gaiman* created an exception to *Childress.* *See* Doc. No. 89, n.2. *Gaiman* did nothing of the kind. *Gaiman* did not even discuss *Childress* but merely cited it once for a proposition related to adverse possession and co-tenancy. *See Gaiman,* 360 F.3d at 654.

evidence supporting the jury's copyright findings."[17]  *Id.* at 796.  That evidence included testimony that (1) Flynn and others had discussed the movie as a "joint project," (2) Flynn had prepared a "'treatment' that outlined the essential elements" of the movie, (3) the movie was to adhere to that treatment, (4) Flynn drafted original questions to be used in the documentary's on-camera interviews, and (5) Flynn "drafted, compiled and otherwise supplied a significant amount of information about various groups and individuals" featured in the movie.  *Id.*  "Presented with this evidence, the jury determined that Flynn and Johnson (another person involved in the movie) intended to be joint authors and that Flynn's contributions to the documentary were independently copyrightable" under jury instructions that followed *Childress.  Id.*

Now, under XL's view of *Childress*, Flynn would have had no prayer of success because she did not operate a camera or develop any film.  But as Judge Ellis implicitly found, and as the *Talksip* court explicitly found, that view of *Childress* does not really fit the computer world.  *See Talksip*, 2005 U.S. Dist. LEXIS at *19-20.  There are universities and valleys, full of brilliant programmers who can write the most excellent code but who have no idea what businesses want or need for specific applications.  They could sit and type for a solid year, but without direction on "the certain result" the program needs to bring about, 17 U.S.C. § 101, all of their programming skill is worthless.  The skilled programmer must be guided by the skilled businessperson in order that a functional, marketable, desirable program be created.

XL relies heavily upon *Whelan Assoc., Inc. v. Jaslow Dental Lab., Inc.,* 609 F. Supp. 1307 (E.D. Pa. 1985) for the proposition that it is entitled to summary judgment. *Whelan* does not support XL in any way, shape or form.  Jaslow ran a dental laboratory.  *Id.* at 1309.  Jaslow dreamed of writing software that would automate his company's business operations.  *Id.*  He bought a Radio Shack computer and tried mightily to write some programs, but he failed.  *Id.*

---

[17] The jury was charged on Childress principles "without objection."  *Id.* at 793.

Jaslow eventually reached out to Strohl Systems, a company that was half owned by Elaine Whelan and that was in the very business of "designing and marketing computer software programs for use in the business operations of dental laboratories." *Id.* Whelan was designated to "lead the Strohl Systems team." *Id.* at 1310. Strohl began work under a proposal letter that was supplemented to provide that "all software developed by [Strohl] for [Jaslow's] dental laboratory remain under [Strohl's] ownership." *Id.* That proposal was accepted by Jaslow. *Id.* "At all times, the designing of the computer system was under the direct supervision and control of Elaine Whelan, and it was she who actually designed the system." *Id.* To do this, she learned the methods and needs of Jaslow. *Id.* Because the system was intended to be modifiable for sale to other dental labs, she also "did a substantial amount of independent study and research as to the methods of operation of other dental laboratories in order to design a system that would be readily adaptable to other laboratories." *Id.* Later, when a dispute over royalties and sales to others arose, Jaslow claimed that he was a co-owner of the software. *Id.* at 1316.

Jaslow's claim stemmed from his assertion that he "originated the concept of developing an overall computer program that could accommodate the business needs of a dental laboratory," that he told Whalen how his lab worked and that he helped design the language and format of some of the screens. *Id.* at 1318. After hearing all of the evidence at trial, the court concluded that Whelan and her staff were the sole authors because (1) there was never any intent that he be an owner or author—a contract said exactly the opposite—and (2) all Jaslow did was "little more than explain the operations of the dental laboratory business and define the information he wanted to be able to obtain from the computer." *Id.* XL likens LFC to Jaslow, but XL is wrong. In the first place, we have a contract in which the service and the software that runs it are jointly owned by LFC and XL. That is exactly the opposite of *Whelan*. Second, LFC's analog is not

Case 3:11-cv-00800-REP   Document 99   Filed 07/02/12   Page 21 of 28 PageID# 1394

Jaslow, it is Whelan.  LFC, like Whelan, "did a substantial amount of independent study and research as to the methods and operations of" pharmaceutical companies and told the programmers what to do to create a system that would actually work for pharmaceutical customers.  *Id.* at 1310.  Whelan did not win because she hit the keys.  She won because she provided the creative spark that led to the software and because there was never any intention that Jaslow be a joint author.

XL's other cases do not support its call for summary judgment.  *Softel, Inc. v. Dragon Med. & Sci. Comm., Inc.,* 1992 U.S. Dist. LEXIS 9502 (S.D.N.Y. Jun. 29, 1992) was decided on the court's determination, after a bench trial, that the parties never intended their work be part of a unitary whole.  *Id.* at *43.  *Woods v. Resnick,* 725 F. Supp. 809 (E.D. Wis. 2010) was decided on its particular facts and did not take into account the cases discussed above.  *S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081 (9th Cir. 1989) noted, "Authorship is a question of fact" and that the putative co-author there merely contributed an idea.

There is, to quote Judge Ellis, "abundant evidence" from which the jury could draw conclusions different than those XL draws.  *See Berman*, 518 F. Supp. 2d at 796.

B.    Work For Hire.

LFC agrees with the magistrate judge's view and has explained its reasons in its response to XL's objections to his report and recommendation.  LFC will not repeat those arguments here. Suffice it to say there is plenty of evidence that the XL programmers who worked on this software were doing so for the joint venture and that the joint venture is an "other person for whom the work was prepared" and, therefore, "the author for purposes of this title."  Just as one spouse becomes a co-owner of the copyright in software written by the other spouse in a community property state, *In re Marriage of Worth,* 195 Cal. App. 3d 768, 241 Cal. Rptr. 135

(1st Dist. 1987), LFC is the co-owner of the copyright as a 50/50 owner of the joint venture for which the work was created.

LFC respectfully requests that the Court allow the jury to decide whether LFC is a co-owner of the copyright.

IV.   <u>There Is Evidence From Which A Jury Could Find That XL Breached The Joint Venture Agreement.</u>

After the termination of the JVA, the parties were supposed to have an accounting which valued the assets and liabilities of the joint venture and to either (a) wind the business up, (b) sell it to a third party or (c) if one party wanted to carry on that business, it paid the other party for the latter's share of the business.  (Ex. I, Lines 50-56.)  None of that happened because of XL's wrongful acts, and those acts are the bases of LFC's breach of contract claim.

XL attempts to avoid a trial through four bald declarations, each of which is meritless.

XL first says that there was no duty to value assets as part of the winding up process.  XL misunderstands the requirements of winding up and of an accounting.   Fixing assets and liabilities is exactly what an accounting is.  "An 'accounting' is defined as an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due."  1 Am. Jur. 2d Accounts and Accounting § 52.  Every balance sheet is supposed to have two columns: assets and liabilities.  Pennsylvania's Uniform Partnership Act provides, "In settling accounts between the partners after dissolution, the following rules shall be observed, subject to any agreement to the contrary: (1) The assets of the partnership are: (i) the partnership property." 15 Pa. Cons. Stat. § 8362.[18]  Pennsylvania's Business Law Encyclopedia states, "As a general

---

[18] In Pennsylvania, the relation of the parties to a joint venture is so similar to that of partners that their rights, duties and liabilities are usually tested by partnership rules.  *See West v. Peoples First Nat'l Bank & Trust Co.,* 378 Pa. 275, 106 A.2d 427 (1954); *Snellbaker v. Herrmann,* 315 Pa. Super. 520, 462 A.2d 713 (Pa. Super. Ct. 1983); *Kiewit East'n Co., Inc. v. Kiewit/Perini, A Joint Venture,* 44 F.3d 1194 (3d. Cir. 1995).

rule, a settlement of partnership affairs must be had before the rights of the partners in the firm property can be determined and the property distributed among them." 38 Penn. Bus. Law. Encycl. Partnerships § 234. It further provides that "[a]ll property and transactions belonging to the partnership and forming part of its assets, whatever their nature, must be brought into the final accounting on the settlement of the firm's affairs." *Id.* § 237. As a matter of contract and a matter of law, the accounting between the parties had to include a valuation of assets. XL's argument that a jury could not conclude that assets should be considered is wrong as a matter of law and risible as a matter of fact.

Next, XL argues that there are no assets and that "there is nothing in the Agreement that contemplates that there would be any assets (aside from a possibility of cash profits)…." (Doc. No. 89 at 23.) This, too, is absurd. The whole purpose of the joint venture was to create a web-based PDMA sample management system. One cannot run a service on the web without software. The JVA speaks of "software development capabilities … necessary to execute the proposed service offering." (Ex. I at Lines 8-9.) The documents leading up to the JVA speak of LFC's "ability to provide direction for the development of a state of the art PDMA Compliant Sample Management application" and that XL believed it had "the ability to develop the required software…." (*See* Ex. E, Schmucker Dep. Ex. 6, pp. 2-3.) A jury could certainly find that the parties intended to create and did create software that was an asset of the joint venture. XL's bald assertion that there is no evidence otherwise is mistaken.

XL then maintains that it has the right to run off with ClaritySM and use it for itself because it owns the software. XL makes the mind-boggling argument that the "time, capital, skill and expertise" it and LFC contributed to the software are partnership assets but that the software itself is not. LFC contends, of course, that it is a co-owner of the software through the

23

Copyright Act and through the JVA.  There is a rather substantial dispute of fact over that.

Finally, XL contends that it cannot be held liable for failure to participate in an accounting because it did make accountings.  The problem here is that these accountings were false. They were balance sheets that listed liabilities but no assets.  (*See* Exs. W & X, XL Accountings.)  It failed to recognize the underlying ClaritySM software as an asset even though it had identified ClaritySM as an asset by capitalizing its costs in its financial statements.  (*See Id.*, Wiedemann Dep. 316:7-317:4; *see also* Ex. Y, Martin Dep. 53:4-12 ("When you capitalize an asset, you recognize it as an asset and identify the cost of creating it.")  XL made a false accounting, one that did not even attempt to fairly wind up the business but one that instead sought to make LFC reimburse XL for the value of its contributions.  (*See* Ex. Z, Martin Expert Report, Ex. C.)  In that respect, the so-called accounting clearly violated Pennsylvania's rules (a) that one joint venturer cannot compel the other to reimburse him for his contributions and (b) that contributions are not "costs."  *See Snellbaker v. Herrmann,* 315 Pa. Super. 520, 462 A.2d 713 (Pa. Super. Ct. 1983).

XL has not only failed to establish the absence of a dispute of material fact, it has failed to make any sensible arguments.  A jury could easily conclude that XL breached its duties during the joint venture and during the winding-up through false accountings, misappropriation of joint venture property and the like.

V.    Count III Is Based Upon An Alternative Theory That A Jury Could Endorse In The Unlikely Event It Accepts Mr. Schmucker's Claims.

In Virginia, a party alleging fraud must prove "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party mislead, and (6) resulting damage to the party mislead by clear and convincing evidence."  *Cohn v. Knowledge Connections, Inc.*, 266 Va. 362, 367, 585 S.E.2d 578, 581 (2003).  A party may

also allege a cause of action for fraud in the inducement to a contract.  "A false representation of a material fact, constituting an inducement to a contract, on which the [party] had a right to rely, is always ground for rescission of the contract."  *George Robberecht Seafood, Inc. v. Maitland Bros. Co.*, 220 Va. 109, 111-12, 255 S.E.2d 682, 683 (1979).  It can also be grounds for damages.  *Id.*, 220 Va. at 112, 255 S.E.2d at 683.

In the recommendation issued by the Magistrate Judge, the Court said that although Virginia recognizes that one can allege both fraud and breach of contract, *Patrick v. Summers*, 235 Va. 452, 454-55, 369 S.E.2d 162, 164 (1988) (internal citation omitted), LFC "fails to allege sufficient allegations that "XL Group intended to mislead it when the parties executed the Agreement."  (*See* Doc. 82 at 19.)  In Mr. Schmucker's deposition, that intent is presented to the Court.

Mr. Schmucker insists that the addition of Lines 57-60 to the JVA had the effect of giving XL title to any software that was created during the course of the joint venture.  *See* Ex. I, Lines 57-60.  He has testified that he secretly changed his intent from what it had been—that XL and LFC jointly own the fruits of the joint venture—to a new intent: that XL would own all of the assets and that LFC got only half of the liabilities.  (Ex. B, Schmucker Dep. 74:1-75:19, 79:7-84:23.)  His position is without foundation in fact or law.  It is universally held that the assets developed during a joint venture belong to the joint venture and there is not and could be nothing in the agreement to the contrary.  *See Blood v. Ludlow Carbon Black Co.*, 150 Pa. 1, 5 24 A. 348, 349 (1890) ("The minds are individual, but the results are joint, and the results of joint action of the members are results of action by the firm, and if in the course of the partnership business, the result becomes partnership property.")  If one joint venturer got all the assets and another got only liabilities, that is not a joint venture; it is a scam.  But in the unlikely event that the Court

permits XL and Mr. Schmucker to even make that argument, and in the more unlikely event that the Court would so interpret the contract and the jury would find the facts in XL's favor, then, by Mr. Schmucker's own admission, he perpetrated a fraud in the inducement by secretly harboring an intent to lure LFC into an incredibly lopsided agreement in an attempt to place LFC on the hook for XL's salaries and expenses.

If XL attempts to and does succeed in convincing the jury that the contract allowed XL to run off with the core creation of the joint venture, then XL should be liable for fraudulently inducing LFC to enter into that agreement.

VI.    A Jury Could Find That XL Breached Its Fiduciary Duties To Its Joint Venturer.

Under Pennsylvania law, "a joint venturer owes a fiduciary duty of the utmost good faith and must act toward his associate with scrupulous honesty."  *Snellbaker,* 315 Pa. Super. at 528, 462 A.2d at 718 (Pa. Super. Ct. 1983).

> "The relationship between those in a joint venture is fiduciary in nature; upon each coadventurer are imposed obligations of loyalty, fairness, good faith and full disclosure toward his fellow coadventurers. Particularly is this true in the case of that coadventurer to whom is intrusted the conduct of the enterprise, toward [***17] his associates he occupies the position of a trustee."

*McRoberts v. Phelps,* 391 Pa.2d 591, 603, 138 A.2d 439, 445 (1958).  Although Magistrate Judge Novak ruled, based on a pleading filed many months ago, that LFC's second amended complaint failed to set forth "allegations of fact giving rise to a plausible inference that XL Group exercised bad faith,"  (*See* Doc. No. 82 at 21) discovery has since revealed sufficient facts that demonstrate XL's bad faith and breach of fiduciary duty.

It is well settled that the fiduciary duties of joint venturers "continue through the winding-up period.  Thus, the winding-up [venturers] are accountable for their actions.  In general, this means that winding-up [venturers] may not run the business for their own benefit

and must account as trustees" to the withdrawing venturer. Bromberg & Ribstein on Partnerships, § 7.08 (2012 Supp.). Here, there is ample evidence that XL breached its fiduciary duties to LFC by (1) registering the ClaritySM trademark for itself and itself alone over LFC's objection (Ex. A, Foster Dep. 591:5-12); (2) absconding with the jointly owned software; and (3) presenting false accountings that fail to account for the joint venture's asset. (See Exs. S & T, Foster Dep. Ex. 128, 129.)  These are all examples of XL's lack of good faith and fair dealing with its co-venturer and, individually, they are sufficient to sustain a claim for breach of fiduciary duty.  Together, they are more than enough.

VII.    <u>XL's Has Not Shown It Is Entitled to Judgment On Its Counterclaim.</u>

On this point, XL offers no argument at all.  It merely requests in its Conclusion, without any evidence or discussion at all, that "the Court enter an Order … granting summary judgment to XL Group on its counterclaim."  It does not say why.  In any event, the disputes demonstrated above would suffice to meet any argument XL might have made.

Conclusion

LFC respectfully requests that the Court deny XL's motion for summary judgment in its entirety.

L. FOSTER CONSULTING, LLC

By Counsel

<u>/s/ Christopher C. Spencer</u>
Christopher C. Spencer (VSB # 21878)
Direct Dial: 804.285.5220
Email: cspencer@ohaganspencer.com
Sandra M. Holleran (VSB # 28808)
Direct Dial: 804.285.5222
Email: sholleran@ohaganspencer.com
Matthew T. Mikula (VSB # 81485)
Direct Dial: 804.285.5224

Email: mmikula@ohaganspencer.com
O'Hagan Spencer LLP
6806 Paragon Place, Suite 200
Richmond, Virginia 23230
Facsimile: 804.285.5210

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 2nd day of July, 2012, the foregoing was electronically filed and served using the CM/ECF system on the following parties:

Hugh M. Fain, Esq. (VSB # 26494)
hfain@spottsfain.com
Mary Elizabeth Davis, Esq. (VSB # 41908)
mdavis@spottsfain.com
Elliot P. Fitzgerald, Esq. (VSB # 76724)
efitzgerald@spottsfain.com
Robert D. Michaux. Esq. (VSB # 80701)
rmichaux@spottsfain.com
Spotts Fain PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219

_____/s/_____
Christopher C. Spencer (VSB # 21878)
Direct Dial: 804.285.5220
cspencer@ohaganspencer.com
O'Hagan Spencer LLP
6806 Paragon Place, Suite 200
Richmond, Virginia 23230
Facsimile:  804.285.5210

28